UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice<br>Antitrust Division<br>450 Fifth Street, N.W. Suite 7000<br>Washington, D.C. 20530<br><br>        Plaintiff,<br><br>        v.<br><br>GRAY TELEVISION, INC.,<br>4370 Peachtree Road, NE<br>Atlanta, GA  30319<br><br>and<br><br>SCHURZ COMMUNICATIONS, INC.,<br>1301 E. Douglas Road<br>Mishawaka, IN  46545<br><br>        Defendants. | **CASE NO.**<br><br>**JUDGE:**<br><br>**FILED:** |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States brings this civil action to enjoin the acquisition by Gray Television, Inc. ("Gray") of Schurz Communications, Inc. ("Schurz") and to obtain other equitable relief.

**I.     NATURE OF THE ACTION**

1. Gray and Schurz own and operate broadcast television stations in multiple Designated Market Areas ("DMAs") in the United States.

2. Gray's and Schurz's television stations compete head to head for the business of local and national companies that seek to advertise on broadcast television stations in the South Bend, Indiana DMA, and the Wichita, Kansas DMA.

3. In the South Bend, Indiana DMA, the two broadcast television stations that Gray and Schurz operate account for approximately 67 percent of all broadcast television station gross revenues in that DMA.

4. In the Wichita, Kansas DMA, the three stations that Gray and Schurz operate account for approximately 57 percent of all broadcast television station gross advertising revenues in that DMA

5. Pursuant to an Asset Purchase Agreement dated September 14, 2015, Gray agreed to acquire Schurz for approximately $440 million.

6. If consummated, the proposed acquisition would eliminate the substantial head-to-head competition between Gray and Schurz in the South Bend, Indiana DMA, and the Wichita, Kansas DMA (collectively "the DMA Markets").  Unless enjoined, the proposed transaction is likely to lead to higher prices and substantially lessen competition for broadcast television spot advertising in each of the DMA Markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

**II.   JURISDICTION, VENUE, AND COMMERCE**

7. The United States brings this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Gray and Schurz from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

8. The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

9. Gray and Schurz are engaged in interstate commerce and in activities substantially affecting interstate commerce. They each own and operate broadcast television stations in various locations throughout the United States and sell television advertising for those stations. Their television advertising sales have had a substantial effect upon interstate commerce.

10. Defendants have consented to venue and personal jurisdiction in this District. Therefore, venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

### III.  THE DEFENDANTS

11. Gray is incorporated in the state of Georgia, with its headquarters in Atlanta, Georgia. Gray reported operating revenues of over $508 million for the year ended December 31, 2014. As of February 1, 2015, Gray owned and operated broadcast television stations in 44 geographic markets. It owns and operates broadcast television stations in each of the DMA Markets.

12. Schurz is a privately owned radio, television, cable TV and newspaper company, with its headquarters in Mishawaka, Indiana. Schurz owns and operates 10 broadcast television stations in 7 markets. It also owns and operates broadcast television stations in each of the DMA Markets.

### IV.  RELEVANT MARKET

13. The relevant market for Section 7 of the Clayton Act is the sale of television spot advertising to advertisers targeting viewers in each of the DMA Markets.

14. A DMA is a geographical unit for which A.C. Nielsen Company, a firm that surveys television viewers, furnishes broadcast television stations, advertisers, and advertising

3

agencies in a particular area with data to aid in evaluating audience size and composition. DMAs are widely accepted by television stations, advertisers, and advertising agencies as the standard geographic area to use in evaluating television audience size and demographic composition.

15.     Gray and Schurz sell television advertising to local and national advertisers in each of the DMA Markets.  Gray and Schurz television stations in each of the DMA Markets generate almost all of their revenues by selling advertising to local and national advertisers who want to reach viewers in those markets.  Spot advertising placed on television stations in a DMA is aimed at reaching viewing audiences in that DMA, and television stations broadcasting outside that DMA do not provide effective access to those audiences.

16.     Spot advertising differs from network and syndicated television advertising.  In contrast to spot advertising sales, television networks and producers of syndicated programs sell network and syndicated television advertising on a nationwide basis for broadcast in every market where the network or syndicated program is aired.

17.     Broadcast television stations attract viewers through their programming, which is delivered for free over the air or retransmitted to viewers, primarily through wired cable or other terrestrial television systems and through satellite television systems.  Broadcast television stations then sell advertising to businesses that want to advertise their products to television viewers.  A television station's advertising rates typically are based on the station's ability, relative to competing television stations, to attract viewing audiences that have certain demographic characteristics that advertisers want to reach.

18.     Broadcast television spot advertising possesses a unique combination of attributes that set it apart from advertising using other types of media.  Television combines sight, sound, and motion, thereby creating a more memorable advertisement.  Moreover, of all media,

broadcast television spot advertising generally reaches the largest percentage of all potential customers in a particular target geographic area and is therefore especially effective in introducing, establishing, and maintaining the image of a product.  For a significant number of advertisers, broadcast television spot advertising, because of its unique combination of attributes, is an advertising medium for which there is no close substitute.  Other media, such as radio, newspapers, or outdoor billboards, are not desirable substitutes for broadcast television advertising.  None of these media can provide the important combination of sight, sound, and motion that makes television unique and impactful as a medium for advertising.

19.     Like broadcast television, subscription television channels such as those carried over cable or satellite television combine elements of sight, sound, and motion, but they are not a desirable substitute for broadcast television spot advertising for two important reasons.  First, broadcast television can reach well over 90 percent of homes in a DMA, while satellite, cable and other subscription services often reach many fewer homes.  Even when several subscription television companies within a DMA jointly offer cable television spot advertising through a consortium called an interconnect, cable spot advertising does not match the reach of broadcast television spot advertising.  As a result, an advertiser can achieve greater audience penetration through broadcast television spot advertising than through advertising on a subscription television channel.  Second, because subscription services may offer more than 100 channels, they fragment the audience into small demographic segments.  Because broadcast television programming typically has higher rating points than subscription television programming, broadcast television provides a much easier and more efficient means for an advertiser to reach a high proportion of its target demographic.

20.     While media buyers often buy advertising on subscription television channels, they do so not as a substitute for broadcast television spot advertising, but rather as a supplement,

in order to reach a narrow demographic (e.g., 18–24 year olds) with greater frequency, or to target narrow geographic areas within a DMA.  A small but significant price increase by broadcast television spot advertising providers would not be made unprofitable by advertisers switching to advertising on subscription television channels.

21. Internet-based media is not currently a substitute for broadcast television spot advertising.  Although Online Video Distributors ("OVDs") such as Netflix and Hulu are important sources of video programming, as with cable television advertising, the local video advertising of OVDs lacks the reach of broadcast television spot advertising.  Non-video Internet advertising, e.g., website banner advertising, lacks the important combination of sight, sound, and motion that gives television its impact.  Consequently, local media buyers currently purchase Internet-based advertising primarily as a supplement to broadcast television spot advertising, and a small but significant price increase by broadcast television spot advertising providers would not be made unprofitable by advertisers switching to Internet-based advertising.

22. In addition, broadcast television stations negotiate prices individually with advertisers; consequently, television stations can charge different advertisers different prices.  Broadcast television stations generally can identify advertisers with strong preferences to advertise on broadcast television stations in their DMAs.  Because of this ability to price discriminate among customers, broadcast television stations may target with higher prices advertisers that view broadcast television in their DMA as particularly effective for their needs, while maintaining lower prices for more price-sensitive advertisers.  As a result, a hypothetical monopolist could profitably raise prices to those advertisers that view broadcast television as a necessary advertising medium, either as their sole means of advertising or as a necessary part of a total advertising plan.

## V. LIKELY ANTICOMPETITIVE EFFECTS

23. Broadcast television station ownership in each of the DMA Markets is already significantly concentrated. In each of these markets, four stations, each affiliated with a major network, had more than 90 percent of gross advertising revenues in 2014. In the South Bend, Indiana DMA the two stations that Gray and Schurz operate have approximately 67 percent of all television station gross advertising revenues in that DMA. In the Wichita, Kansas DMA the three stations that Gray and Schurz operate have approximately 57 percent of all television station gross advertising revenues in that DMA.

24. Market concentration is often one useful indicator of the likely competitive effects of a merger. Concentration in each of the DMA Markets would increase significantly as a result of the proposed acquisition.

25. As articulated in the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission, the Herfindahl-Hirschman Index ("HHI") is a measure of market concentration. The more concentrated a market, and the more a transaction would increase concentration in a market, the more likely it is that a transaction would result in a meaningful reduction in competition harming consumers. Mergers resulting in highly concentrated markets (with an HHI in excess of 2,500) that involve an increase in the HHI of more than 200 points are presumed to be likely to enhance market power under the merger guidelines.

26. The post-acquisition HHI in each of the DMA Markets would be over 2,500. In the South Bend, Indiana DMA, the post-acquisition HHI would be approximately 4,800. In the Wichita, Kansas DMA, the post-acquisition HHI would be approximately 4,200. Those HHIs are well above the 2,500 threshold at which the Department normally considers a market to be highly concentrated. In addition, Gray's proposed acquisition of Schurz would result in a

substantial increase in the HHIs set forth above in excess of the 200 points presumed to be anticompetitive under the merger guidelines.

27. In addition to increasing concentration in the DMA Markets, the proposed transaction combines stations that are close substitutes and vigorous competitors in markets with limited alternatives. In each of the DMA Markets, Defendants each have broadcast television stations that are affiliated with the major national television networks, ABC, CBS, NBC and FOX. In the South Bend, Indiana DMA, Schurz owns and operates WSBT-TV, a CBS affiliate; and Gray owns and operates WNDU-TV, an NBC affiliate. In the Wichita, Kansas DMA, Schurz owns and operates KWCH-DT, a CBS affiliate; and Gray owns and operates KAKE-TV, an ABC affiliate. Their respective affiliations with those networks, and their local news operations, provide the Defendants' stations with a variety of competing programming options that are often each other's next-best or second-best substitutes for many viewers and advertisers.

28. Advertisers benefit from Defendants' head-to-head competition in the sale of broadcast television spot advertising in the South Bend, Indiana DMA and the Wichita, Kansas DMA. Advertisers purposefully spread their advertising dollars across numerous spot advertising suppliers to reach their marketing goals most efficiently. After the proposed acquisition, advertisers in each of the DMA Markets would likely find it more difficult to "buy around" the Defendants' combined stations in response to higher advertising rates, than to "buy around" Gray's stations or Schurz's stations, as separate entities, as they could have done before the proposed acquisition. Because a significant number of advertisers would likely be unable to reach their desired audiences as effectively unless they advertise on at least one station that Gray would control after the proposed acquisition, those advertisers' bargaining positions would be weaker, and the advertising rates they pay would likely increase.

29.     De novo entry into the South Bend, Indiana DMA and the Wichita, Kansas DMA is unlikely.  The FCC regulates entry through the issuance of broadcast television licenses, which are difficult to obtain because the availability of spectrum is limited and the regulatory process associated with obtaining a license is lengthy.  Even if a new signal became available, commercial success would come, at best, over a period of many years.  Thus, entry into each DMA Market's broadcast television spot advertising market would not be timely, likely, or sufficient to deter Gray from engaging in anticompetitive price increases or other anticompetitive conduct after the proposed acquisition occurs.

30.     Other broadcast television stations in the South Bend, Indiana DMA and the Wichita, Kansas DMA likely would not increase their advertising capacity in response to a price increase by Gray.  The number of 30-second spots in a DMA is largely fixed by programming and time constraints.  This fact makes the pricing of spot advertising responsive to changes in demand.  Adjusting programming in response to a pricing change is risky, difficult, and time-consuming.  Network affiliates are often committed to the programming provided by the network with which they are affiliated, and it often takes years for a station to build its audience.  Programming schedules are complex and carefully constructed, taking many factors into account, such as audience flow, station identity, and program popularity.  In addition, stations typically have multi-year contractual commitments for individual shows.  Accordingly, a television station is unlikely to change its programming sufficiently or with sufficient rapidity to overcome a small but significant price increase imposed by Gray.

31.     Although Defendants assert that the proposed acquisition would produce efficiencies, they cannot demonstrate acquisition-specific and cognizable efficiencies that would be sufficient to offset the proposed acquisition's anticompetitive effects.

32.     The effect of the proposed acquisition of Schurz by Gray would be to substantially lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act.

## VI.     VIOLATIONS ALLEGED

33.     The United States hereby repeats and realleges the allegations of paragraphs 1 through 32 as if fully set forth herein.

34.     Gray's proposed acquisition of Schurz likely would substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The proposed acquisition likely would have the following effects, among others:

   a. Competition in the sale of broadcast television spot advertising in each of the DMA Markets would be substantially lessened;

   b. Actual and potential competition among Gray and Schurz in the sale of broadcast television spot advertising in each of the DMA Markets would be eliminated; and

   c. Prices for spot advertising on broadcast television stations in each of the DMA Markets would likely increase, and the quality of services would likely decline.

## VII.    REQUEST FOR RELIEF

The United States requests:

   d. That the Court adjudge the proposed acquisition to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

   e. That the Court permanently enjoin and restrain Defendants from carrying out the transaction, or entering into any other agreement, understanding, or plan by which Gray would acquire Schurz;

   f. That the Court award the United States the costs of this action; and

g. That the Court award such other relief to the United States as the Court may deem just and proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

_____
William J. Baer (D.C. Bar #324723)
Assistant Attorney General

_____
David I. Gelfand (D.C. Bar #416596)
Deputy Assistant Attorney General

_____
Patricia A. Brink
Director of Civil Enforcement

_____
David C. Kully (D.C. Bar #448763)
Chief, Litigation III Section

_____
Mark A. Merva* (D.C. Bar #451743)
Trial Attorney

United States Department of Justice
Antitrust Division
Litigation III Section
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
Phone: 202-616-1398
Facsimile: 202-514-7308
Email: Mark.Merva@usdoj.gov

*Attorney of Record

Dated: December 22, 2015